**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

MARK LOUIS BRANDES, SR.,

        Plaintiff,

vs.

CITY OF WATERLOO, IOWA; and
STEVE HOAMBRECKER,

        Defendants.

No. 18-CV-2089-KEM

**MEMORANDUM OPINION
AND ORDER**

_____

## *Table of Contents*

I.    BACKGROUND ................................................................. 2

II.   DISCUSSION ................................................................. 20

  A.    FMLA ................................................................. 20

    1.   Discrimination Claim ................................................ 22

      i.  Adverse Employment Action ...................................... 23

      ii. Discriminatory Intent ............................................ 25

    2.   Entitlement Claim ................................................. 32

  B.   Wrongful Discharge in Violation of Public Policy ................................ 35

  C.   Age Discrimination Under Iowa Law ...................................... 38

  D.   Disability Discrimination Under Iowa Law ...................................... 41

  E.   Intentional Infliction of Emotional Distress ...................................... 44

III.  CONCLUSION ................................................................. 47

After Plaintiff Mark Louis Brandes Sr. was fired, he initiated this lawsuit against his former employer, the City of Waterloo, Iowa, (the City) and his supervisor, Steve Hoambrecker. Brandes alleges violations of his rights under the Family and Medical Leave Act (FMLA) and Iowa state-law claims of wrongful discharge in violation of public policy, age and disability discrimination, and intentional infliction of emotional distress. Defendants move for summary judgment, and Brandes resists. Docs. 24, 33, 37, 40, 41. For the reasons that follow, I **grant** the motion (Doc. 24).

## I. BACKGROUND

The following facts are recited in the light most favorable to Brandes, the nonmoving party. Brandes, who has an associate's degree in construction and civil engineering, began working for the City's engineering department in 1995. Pl. SOF ¶¶ 1-2, 74; Def. Resp. SOF ¶¶ 1-2, 74.[1] In 2004, he sustained a back injury due to a work-related vehicle accident. Pl. SOF ¶ 7; Def. Resp. SOF ¶ 7. Brandes also sustained nerve damage, as well as chronic painful constipation believed to be caused by the nerve damage. Pl. SOF ¶ 9; Def. Resp. SOF ¶ 9. As a result of this accident, Brandes was deemed partially disabled and given permanent restrictions. Pl. SOF ¶ 8; Def. Resp. SOF ¶ 8.

In July 2012, Brandes was promoted to the position of Capacity, Management, Operation, and Maintenance (CMOM) Specialist in the waste management department. Pl. SOF ¶ 3; Def. Resp. SOF ¶ 3. At the time, Larry Smith was the director of the waste

---

[1] "Def. SOF" refers to Defendants' Statement of Facts, filed at Doc. 24-2. "Pl. Resp. SOF" refers to Plaintiff's Response to Defendants' Statement of Facts, filed at Doc. 33-5. "Pl. SOF." refers to Plaintiff's Statement of Facts, filed at Doc. 33-2. "Def. Resp. SOF." refers to Defendants' Response to Plaintiff's Statement of Facts, filed at Doc. 37-1. "Def. App." refers to Defendants' Appendix, filed at Doc. 24-3; "Pl. App." refers to Plaintiff's Appendix, filed at Docs. 33-3, 33-4; "Def. Supp. App." refers to Defendants' Supplemental Appendix, filed at Doc. 37-2; and "Pl. Supp. App." refers to Plaintiffs' Supplemental Appendix, filed at Doc. 40.

management department. After Smith's termination in September 2015, the City contracted with a local engineering firm for one of its engineers, John LaPointe, to serve as the interim director of the waste management department. Def. SOF ¶ 5; Pl. Resp. SOF ¶ 5; Pl. SOF ¶¶ 26, 32; Def. Resp. ¶¶ 26, 32. LaPointe acted as Brandes's supervisor from October 2015 until June 13, 2016, when the City hired Hoambrecker to fill the director position permanently. *Id.* Prior to Hoambrecker's arrival, Brandes had never been written up or disciplined regarding his job performance. Pl. App. 96.

During his time as interim director, LaPointe found Brandes's work performance deficient. Def. Supp. App. 102-104. According to LaPointe, Brandes routinely failed to follow his instructions on what to do; failed to attend CMOM or sanitary sewer meetings, despite LaPointe requiring Brandes to keep minutes of the meetings; and failed to make recommendations about steps to take to solve problems, preferring instead to spend his time in the field observing problem areas and reporting their existence. *Id.* LaPointe indicated that he was forced to work around Brandes to get things done. *Id.* As interim director, LaPointe felt he did not have the power to discipline Brandes, but when Hoambrecker was hired, LaPointe conveyed his dissatisfaction with Brandes's performance to Hoambrecker. *Id.*; Def. App. 50-51. During LaPointe's time in the waste management department, Brandes missed work almost 20% of the time (including a two-week period covered by FMLA to care for his father), but his absences were all covered by paid vacation and sick leave. Pl. Resp. SOF ¶ 26; Pl. App. 153-58, 276-77. LaPointe indicated that although "Brandes did have some absences or time off from work, even when he was at work[,] he simply was not doing his routine, ordinary, assigned tasks." Def. Supp. App. 102. Brandes submitted an affidavit indicating he "never felt harassed by . . . LaPointe," and he testified at his deposition that his only complaint about LaPointe was LaPointe's failure to follow the "hierarchy" by asking others to complete assignments without asking Brandes first. Def. App. 37-38; Pl. App. 82.

From the beginning of Hoambrecker's time as Brandes's supervisor, Brandes believed Hoambrecker was "hostile and abusive" to him. Def. SOF ¶ 10; Pl. Resp. SOF

3

¶ 10.  According to Brandes, during Hoambrecker's first week, Hoambrecker observed Brandes not wearing his seatbelt and told him that if it happened again, he would "write [him] up" or terminate him.  Pl. App. 80.  Shortly thereafter, Hoambrecker told Brandes that he heard he "talk[s] to the City Council" and goes out to eat with Smith, his former supervisor (who sued or was suing the City for age discrimination); and that he had looked at Brandes's personnel file.  Pl. App. 80.  At the end of Hoambrecker's second week, on June 24, 2016, Hoambrecker and Human Resources (HR) Manager Cheryl Huddleston met with Brandes to discuss his job duties.  Pl. SOF ¶¶ 35-37; Def. Resp. SOF ¶¶ 35-37.  The corresponding memo of the meeting indicated that Hoambrecker expected Brandes to attend all CMOM-related meetings and stay for their duration (noting that Brandes missed several such meetings the previous week) (Brandes testified at his deposition that he missed meetings or stepped out during meetings either to answer phone calls from sewer workers or to go to the bathroom due to his health issues).  Def. App. 52; Pl. App. 171-72.  The memo also noted that Brandes expressed frustration with LaPointe going around him to obtain information from Laura Wolff, the CMOM Technician and Brandes's subordinate, instead of Brandes.  *Id.*  Hoambrecker explained that LaPointe went to other sources for information only after Brandes failed to comply with LaPointe's requests for information.  *Id.*  Hoambrecker indicated that he expected Brandes to produce documents when Hoambrecker requested them, and in return, Hoambrecker stated that he would keep Brandes in the loop and go through him to request information.  *Id.*

The memo also indicated that Brandes had been performing duties "that are more the responsibility of the Collections Systems[ ]Maintenance Supervisor."  *Id.*  Technically, Brandes, as the CMOM Specialist, was to report to the Collections System Maintenance Supervisor, who in turn reported to Hoambrecker, but the Collections System Maintenance Supervisor position had been vacant since October 2013.  *Id.*; Pl. SOF ¶ 10; Def. Resp. SOF ¶ 10.  When the previous person who held that position retired in October 2013, Smith, then-director of the waste management department,

4

emailed the mayor requesting that Brandes serve in the position on an interim basis. Pl. SOF ¶ 12; Def. Resp. SOF ¶ 12; Pl. App. 107. The mayor replied that "[t]o make [Brandes] a supervisor, even on a temporary basis," the city council would have to approve the measure, and Brandes would receive a pay increase. Pl. App. 107. The mayor continued that they would then have to "undo" those steps as soon as they hired a replacement, so he indicated he would "rather try to get by until we get the new permanent position filled" without making Brandes the interim supervisor. *Id.* Smith responded he had not asked for Brandes to become a supervisor, but simply wanted to note that he and Brandes were picking up the slack of the vacant position and that Brandes understood he performed sewer-maintenance duties through his CMOM position. *Id.* The mayor replied that they had to follow procedure and that "picking up the slack" had not worked out well in the past. *Id.* The mayor indicated he would authorize the request for Brandes to be the interim "supervisor over sewer maintenance," in which he would receive a salary increase, but they had to follow the proper procedure to make that happen, including having the HR Committee approve the request. *Id.* Huddleston, the HR Manager, replied that it seemed unfair for Brandes to receive a supervisor's salary when he was only assuming some, but not all, of the duties of the position. *Id.* Brandes never received the increased salary, and he never became the official Interim Collections Systems Maintenance Supervisor, although he performed the duties of that position. *See* Pl. SOF ¶ 28; Def. Resp. SOF ¶ 28; Def. App. 52; Pl. App. 79, 90, 323. In January 2016, when LaPointe was in charge of the department, LaPointe requested that Brandes continue covering the Collections Systems Maintenance Supervisor position. Pl. SOF ¶ 33; Def. Resp. ¶ 33; Pl. App. 323. At the meeting with Hoambrecker in June 2016, however, Hoambrecker indicated he no longer wanted Brandes to direct sewer maintenance as he had been doing. Def. App. 52.

On August 5, 2016, Brandes completed paperwork requesting FMLA leave for a serious medical condition to begin on August 29, 2016. Pl. App. 278. Brandes had provided a note from his primary care provider, but the note did not contain dates

5

indicating when Brandes would need to miss work due to his illness or what absences in the past were due to illness. Pl. App. 47. Thus, the FMLA paperwork indicated that Brandes's request for leave was not approved and that he needed to provide sufficient certification to support his request for intermittent FMLA leave by September 14, 2016. Pl. App. 278. Huddleston issued Brandes a new form for his doctor to fill out and told Brandes that his providers at the Mayo Clinic should complete the form, since those providers would know which dates Brandes received treatment at the Mayo Clinic for his back and gastric issues (and which absences were therefore covered under the FMLA). Def. App. 41; Pl. App. 47; Pl. Supp. App. 30, 32, 35. Brandes never provided the requested certification from his doctors at the Mayo Clinic. On November 3, 2016, Huddleston emailed Brandes, informing him that if she did not receive the FMLA paperwork from Brandes's Mayo Clinic doctors by November 11, 2016, his request for FMLA leave would be denied. Pl. Supp. App. 32. This proved to be untrue: on November 16, 2016, Huddleston emailed Brandes noting that because she had still not received FMLA certification, "any sick hours used since [Brandes] first reported a chronic health issue at the beginning of August 2016 will be counted towards FMLA leave," as well as "[a]ny other paid time off when [Brandes] indicated it was to 'go to Mayo' or other similar notification," and "[a]ny unscheduled, unpaid hours, unless [the City] know[s] of another reason." Pl. Supp. App. 37; *see also* Def. SOF ¶¶ 73-74; Pl. Resp. SOF ¶ 73-74; Def. App. 41. Huddleston told Hoambrecker via emails that she was counting Brandes's use of FMLA leave beginning August 29, 2016, and she suggested that Hoambrecker keep her abreast of whether Brandes's use of vacation time was to go to the Mayo Clinic or was otherwise related to his health condition, as it should count toward his FMLA leave. Pl. Supp. App. 37-42.

Brandes took FMLA leave from August 29 through September 5, 2016, which also counted as paid vacation time. Pl. Supp. App. 33. While he was out on leave, Hoambrecker and Huddleston discussed that Brandes had not signed the June 24, 2016 memo regarding his job performance—a handwritten notation on the memo indicated that

6

Brandes wanted to review it with his attorney first. Def. App. 52. On September 2, 2016, Huddleston emailed Hoambrecker:

> Re [Brandes] refusing to sign the [Performance Improvement Plan (PIP)]—she[2] said the same thing as me—we term him. She will speak to labor attorney if that would make you feel more comfortable; we may not have answer from him by Tuesday [September 6] but, if we don't, we will send [Brandes] home on unpaid suspension and start the pre-termination interview process. Just telling him he is suspended with possible further disciplinary up to and including termination may change his mind about signing.

Pl. SOF ¶¶ 90-91; Def. Resp. SOF ¶¶ 90-91; Pl. App. 353. Hoambrecker responded to Huddleston on Tuesday, September 6, when Brandes had been scheduled to return to work, that Brandes was still out of the office, so they would need to reschedule for the next day. Id.[3]

Brandes returned to work for a half day on Wednesday, September 7, 2016, and was issued a written warning from Hoambrecker in the form of a Performance Improvement Plan (PIP). Pl. SOF ¶¶ 92-96; Def. Resp. SOF ¶¶ 92-96; Def. App. 53-55. The problem of the "most concern" identified by the September PIP related to letters Hoambrecker wanted sent to four residences regarding smoke testing and corrective action homeowners needed to take. Id. The PIP indicated that the task was added to the department list of ongoing tasks on August 2, 2016, with an expected completion date of August 15, 2016. Id. When the expected completion date was not met, Hoambrecker emailed Brandes on August 25, 2016, to remind him to complete the letters. Id. Brandes provided drafts of the letters to Hoambrecker on August 29, 2016, but Hoambrecker

---

[2] It is unclear who the "she" in the email refers to.

[3] Brandes used "casual time" for the September 6 absence (Pl. App. 160), and Huddleston later inquired with Hoambrecker and his secretary (in November 2016) whether this time off related to his serious illness such that it would be covered by the FMLA. Pl. App. 160; Pl. Supp App. 33. Huddleston's secretary indicated she had no evidence Brandes took this day off for "a sick purpose." Pl. Supp. App. 34. Defendants never provided Brandes with a list of which dates Huddleston ultimately counted toward his FMLA leave, so it is not clear whether Huddleston considered the September 6 absence as covered by the FMLA (but it appears not).

Case 6:18-cv-02089-KEM   Document 45   Filed 07/22/20   Page 7 of 47

found the letters unacceptable, as he thought they were poorly written and provided no specific direction to the residents. *Id.* The PIP indicated that because Brandes was out on leave, Hoambrecker asked Wolff to complete the letters, which she did. *Id.* There is no law or ordinance allowing the City to fine residents if they fail to make the repairs requested by the letters, and the City had very little authority to force the homeowners to make the requested repairs. Pl. SOF ¶¶ 95-96; Def. Resp. SOF ¶¶ 95-96. Brandes submitted an affidavit suggesting that this is the reason he did not complete the letters as quickly as Hoambrecker wanted—he did not think they were a high priority. Pl. Resp. SOF ¶ 15; Pl. App. 81. Brandes's affidavit also states that the letters were unfinished drafts: because he did not know how to handle the enforcement issue, he wanted to talk to Hoambrecker about it, and when Hoambrecker was unavailable, Brandes left the unfinished letters on Hoambrecker's desk since Brandes would be out on leave the following week. Pl. App. 81.

The September PIP also noted that Brandes had raised the issue about the lack of enforcement options for residents who needed to make repairs to their private sewer lines, and he had been tasked with completing a draft ordinance by July 15, 2016. Pl. Resp. SOF ¶ 15; Def. App. 54. Brandes did so. Def. App. 54; Pl. App. 82. But the PIP indicated that when Hoambrecker emailed Brandes on August 25, 2016, requesting an update on the policy, Brandes did not provide the requested update and instead suggested the task should be removed from the department's list of objectives. Def. App. 54. The ordinance has not been implemented to this day, which Brandes suggests is evidence of the assignment's nonimportance. Pl. App. 82.

Finally, the PIP noted that on August 8, 2016, Wolff had requested information from Brandes, and on August 10, 2016, Hoambrecker requested that same information, but neither ever heard back from Brandes. Def. App. 54. The PIP indicated that Wolff ultimately had to work with someone at an outside engineering firm to obtain the information. *Id.* The PIP concluded that this and Brandes's failure to complete the letters

8

to the residents were both additional examples of Wolff having to complete tasks because of Brandes's nonperformance of duties. *Id.*

On October 31, 2016, Hoambrecker emailed Huddleston and two others about CMOM duties. Pl. SOF ¶ 99; Def. Resp. SOF ¶ 99; Pl. App. 355-56. Hoambrecker indicated that "what is needed" is "[two] of [Wolff] along with filling . . . the Collection System Superintendent position." Pl. App. 355. Hoambrecker proposed creating a new position for Wolff with increased pay, as well as a new assistant position for her, concluding that the "CMOM program is a [two-]person job, if we have the correct [two] people performing that job." Pl. App. 355-56. Hoambrecker also indicated that filling the long-vacant sewer supervisor position would help "provid[e] direction to this revised CMOM group." Pl. App. 356. Huddleston responded:

> This does not solve the situation with [Brandes]. So you would essentially eliminate the CMOM Specialist position altogether – but what if [Brandes] applies for the [new position intended for Wolff]? . . . How would you justify not giving the position to him. I know you say he cannot do the job and I don't disagree, but I see so many red flags here, whether it be civil service or union issues or [Brandes] actually filing some type of lawsuit. If I was looking at this totally from the viewpoint of someone who does not know the history of [Brandes] and [Wolff] – you would have a difficult time convincing me there isn't something shady happening.

*Id.* Hoambrecker replied that Huddleston raised "good questions" that needed "consensus as to how to pursue with the situation at hand" and indicated he "still need[ed] to pursue the PIP process that [he] ha[d] been working on." *Id.*

On November 8, 2016, Hoambrecker updated the Performance Improvement Plan. Def. App. 56-57. The updated PIP indicated that Brandes had helped the waste management department handle the impact of a major flood, but that other aspects of Brandes's performance continued to be poor. *Id.* The November 2016 PIP indicated that Brandes had not worked to ensure the four residences fixed their smoke-testing issues or on the private-sewer ordinance, issues identified by the September 2016 PIP. *Id.* It imposed a deadline of December 1, 2016, for Brandes to develop a plan to resolve these

9

issues. *Id.* The November 2016 PIP also identified several new issues for Brandes to work on and implemented deadlines for him. *Id.* In addition, the PIP noted that although Brandes had requested a white board to use to help him direct sewer crews, he had not used it—but Brandes had requested the white board when he was still performing duties related to the Collections System Maintenance Supervisor position, and Hoambrecker had told Brandes to cease directing the sewer crews in June 2016. *Id.*; Pl. SOF ¶¶ 103-106; Def. Resp. SOF ¶¶ 103-106; Pl. App. 82. Finally, the PIP noted two instances in which Brandes had failed to respond to requests from Wolff, resulting in Hoambrecker providing Wolff with the information instead. Def. App. 56-57. As a result of Brandes's deficient performance outlined in the November 2016 PIP, he was suspended for five days without pay. *Id.*

Brandes complied with the deadlines imposed by the November 2016 PIP. Def. App. 67. On December 2, 2016, Hoambrecker provided Brandes feedback on what he had submitted, noting that he wanted more detailed information on the smoke-testing issue and giving him more specific direction on the format Brandes should use for his proposed plan of action. Def. App. 58. On December 30, 2016, Hoambrecker provided additional feedback. Def. App. 64.[4] Hoambrecker noted that Brandes did not follow the format he suggested for the smoke-testing issue in early December. Def. App. 65-66. Hoambrecker also discussed other documents submitted by Brandes, concluding that they were not as detailed as they needed to be and that "[t]he material submitted falls extremely short of expectations." Def. App. 66-67. Hoambrecker recognized that Brandes was "trying to comply with [his] requests and trying to address the concerns outlined in the

---

[4] There is a memo in the record from Hoambrecker dated December 20, 2016, providing duplicative feedback on items produced by Brandes in accordance with the November 2016 PIP's deadline, but it does not seem that Hoambrecker provided this memo to Brandes—Brandes emailed Hoambrecker on December 22 to ask if Hoambrecker had any comments on the items submitted on December 15. *See* Def. App. 60-67.

10

[PIP]," but he found Brandes's performance substandard in two areas: analysis and written communication. Def. App. 64.

On January 23, 2017, Hoambrecker submitted his final comments to Brandes on deadlines imposed by the November 2016 PIP. Def. App. 68-69. Hoambrecker noted that Brandes had submitted the first item due in early January and "attempted to identify the manpower recommendations," but his submission "did not come close to what was required as outlined in" the PIP. Def. App. 68. Hoambrecker also noted that Brandes was supposed to submit a "Sewer Assessment Plan" in early January, but the document Brandes submitted "could not remotely be considered a 'Sewer Assessment Plan,' but seemed to be just a collection of thoughts and accusations." Def. App. 68. Hoambrecker indicated that Brandes's analysis had not improved since being placed on the PIPs and that he did not provide the level of detail necessary for his position. *Id.* Hoambrecker concluded "[b]ecause there has been no improvement of your performance over the course of the PIP, the City will explore all options to realign staff or make staff changes to ensure future quality service to the City." Def. App. 69. Hoambrecker continued that Brandes did "not have the ability to function in the capacity of CMOM Specialist." Def. App. 69.

In a memo Brandes signed on February 2, 2017, Hoambrecker outlined Brandes's new job duties. Pl. App. 351. Brandes would review TV information and log it, "as outlined and directed by" Wolff. *Id.* The memo also suggested that Brandes could not perform field investigations unless directed by Wolff or Hoambrecker. *Id.* In addition, Brandes was to submit a weekly report detailing his time spent at work and the work performed. *Id.* Brandes received the same pay as he had before, and his job title technically remained the same. Wolff took over Brandes's job duties and eventually received an increase in pay (after filing a union grievance). Pl. App. 10-11. In a deposition, a coworker indicated that Wolff "was given [Brandes's] job, and [Brandes] was given [Wolff's] job." Pl. App. 152. In an email, a city councilperson who was

friends with Brandes characterized the action as a demotion, which was refuted by others given that Brandes's pay remained the same.  Pl. App. 92-93.

From the time Hoambrecker started in June 2015 to his change in duties on January 23, 2017, Brandes missed work about a third of the time, using paid leave.  Pl. App. 158-64.  Some (but not all) of those absences related to his serious health condition, which Huddleston counted toward his FMLA leave allotment.  In February and March 2017, Brandes began to miss even more work.  Between January 23 and March 20, Brandes took 18.5 days of vacation, and four days of sick time.  Pl. App. 163-64.

On March 20, 2017, Hoambrecker met with Brandes, as well as an HR representative and union representative.  Pl. SOF ¶ 111; Def. Resp. SOF ¶ 111. Hoambrecker wanted to discuss Brandes's presence at the plant a few weekends prior. Pl. App. 117 (March 20, 2017 audio recording of meeting).  Brandes explained, "Since I've been on vacation and you've got deadlines due for me, I'm trying to make sure that everything you've asked for is complied with." *Id.*, 1:50.  Brandes asked if Hoambrecker was questioning the other people who had been at the plant that weekend, or just him. *Id.*  Hoambrecker responded that he was just investigating Brandes, explaining that he checked into it because Brandes used a city vehicle, and he wanted to know why.  *Id.* The HR representative explained that they were concerned with Brandes working on weekends because he was not exempt from overtime under the Fair Labor Standards Act. *Id.*  Brandes responded that if he took sick leave for eight hours during the week and then came in on the weekend for eight hours, he would not be entitled to overtime.  *Id.* Hoambrecker stated that going forward, he did not want Brandes to work on weekends. *Id.*  Brandes submitted an affidavit indicating that although he used the word "vacation" during this meeting, "it was understood" he "was taking FMLA during that time and was suffering from a disability" in the form of a "painful bowel condition and back pain." Pl. App. 81.  Brandes's affidavit explains that he described his time off as "vacation" because he "thought [he] had exhausted [his] paid sick time benefit" (even though he

actually had three sick days remaining) and was therefore "utilizing [his] vacation time benefit to cover [his] FMLA absences." Pl. App. 80.

The rest of the week of March 20, 2017, Brandes worked one and a half days, taking one and a half days of vacation (on Tuesday and Wednesday) and a full day of sick leave (on Friday). Pl. App. 164. Brandes had now run out of vacation days, and he had only 16.6 hours of sick time remaining. *See* Pl. App. 164-65. He did not come to work almost the entire week of March 27, 2017, working only 1.5 hours. *Id.* Although Brandes had sick time to cover Monday and Tuesday of that week, Hoambrecker emailed Brandes on Tuesday, March 28, requesting medical justification by April 3 for the use of sick leave, since Brandes had requested the time off in advance. Pl. App. 118 (recording of April 12, 2017 meeting). Brandes did not return to work until Wednesday, April 12, 2017. *See* Pl. App. 165. Upon his return, Hoambrecker held a meeting with Brandes. Pl. App. 118. At the meeting, Hoambrecker indicated that he had not received the requested justification for the use of sick leave and that Brandes's time off had counted as unpaid. *Id.* Brandes provided Hoambrecker with a copy of a doctor's note dated March 29 indicating that Brandes had been unable to work from March 24 to April 5 due to medical illness. *Id.* Brandes provided evidence that his doctor had faxed the note to HR on March 29, but HR denied ever receiving the note. *Id.* Brandes also provided a second doctor's note indicating that he could work only four hours a day, three days a week due to anxiety and depression beginning April 1, 2017, and lasting until April 1, 2018. Pl. App. 281-83. Based on that note, it was agreed that Brandes would work half days for the rest of the week and figure out a permanent three-days-a-week half-day schedule with Hoambrecker later. Pl. App. 118.

At the meeting, Hoambrecker also discussed Brandes's duties—he was to work on cleaning out his office, because his workstation was being moved. *Id.* Because of the move, there was no place for Brandes to watch videos, although Hoambrecker indicated that he would have a workstation for Brandes set up by the next day. *Id.* Brandes's union representative questioned Hoambrecker about why there was no place for Brandes

13

to work, since Hoambrecker had indicated in a March 23 memo that the workstation would be set up by the following week. *Id*. Hoambrecker responded that he did not know if or when Brandes was ever coming back, noting that Brandes had texted him every morning that he would not be at work and never stated when he would return (texts each morning is how Hoambrecker had requested to be informed of Brandes's absences). *Id*. When the union representative stated that he wanted to make sure that Brandes had the tools he needed to do his job, Hoambrecker responded, "Me too, but I've got to have him here." *Id*. Brandes indicated that he had been unwell and in the hospital, and Hoambrecker asked how he was supposed to know that, saying that the first text from Brandes had stated he was in excruciating pain and would have to use FMLA, but subsequent text messages from Brandes just said he would not be coming into work that day. *Id*. Brandes complained about Huddleston's calculation of the amount of FMLA leave he had already used, noting that when he requested sick leave and Hoambrecker approved it, that was not necessarily FMLA leave. *Id*. Brandes also noted that his first request for FMLA leave in August 2016 had been denied, despite it being signed by his primary care provider. *Id*. When Hoambrecker indicated Huddleston had never received the proper certification, Brandes responded that he did not need FMLA leave at that time because he had vacation and other paid leave time on the books. *Id*.

On April 18, 2017, Huddleston completed Brandes's FMLA paperwork related to his mental health, approving his request for twenty-eight hours of FMLA leave a week. Pl. App. 280-81. On the form, Huddleston indicated that as of April 14, 2017, Brandes had already used 311.5 hours of FMLA leave for this FMLA time period, which included the time off Brandes had taken due to his back issues. Pl. App. 281; *see also* Def. Supp. App. 107. There is no official record of which days Huddleston counted as FMLA leave; in her deposition, when asked how she calculated FMLA hours, Huddleston explained, "If it's by hours, the number of hours that they would miss on a day they were scheduled to work. If it's ongoing, we count days and weekends count too then." Pl. App. 46. Going forward, Huddleston counted any absences—even those beyond the twenty-eight

14

hours a week covered by the mental-health FMLA paperwork—as covered under the FMLA. *See* Def. Supp. App. 107.

Brandes worked only two half days the week of April 17 and one-half day the week of April 24. Pl. App. 165. When he came in for his scheduled half day on Tuesday, May 2, Hoambrecker held a meeting with Brandes, a union representative, and an HR representative. Pl. App. 119 (audio recording of May 2, 2017 meeting). Hoambrecker expressed frustration that Brandes had rated only 1.5 videos since February, although he recognized that Brandes had been off a lot. *Id.*; *see also* Pl. SOF ¶ 85; Def. Resp. SOF ¶ 85. Brandes indicated that his workstation to rate videos had not been operational until the previous Friday. *Id.* Hoambrecker then stated that his main issue was that Brandes had not completed his work log the previous week as required. *Id.* Brandes responded that he remembered the work log after he had already left, and he was prohibited from returning after hours. *Id.* Hoambrecker replied that Brandes could have communicated with him by email or text message to tell him that he had forgotten. *Id.* During the meeting, Brandes also indicated that he had received a letter from a lawyer retained by the City, asking to conduct an investigatory interview with him regarding insubordination. *Id.* Brandes called it a "pretermination interview"—which Hoambrecker disputed—because insubordination is a ground for termination. *Id.*

Brandes was friendly with several city councilmembers, who he would occasionally go to lunch with or text or call about issues with the City. *See* Pl. App. 83, 188-97. On May 5, 2017, one of those city councilmembers emailed the mayor and Lance Dunn, the new HR director, about the upcoming "pre-termination hearing for [Brandes]" on Tuesday, May 9. Pl. SOF ¶ 129; Def. Resp. ¶ 129; Pl. App. 91-98. The councilmember questioned many actions taken by Hoambrecker against Brandes. *Id.* The email also questioned Hoambrecker's actions on two matters: (1) accepting a load of waste for disposal by the City from Nutri-Ject Systems, Inc. (Nutri-Ject), a company owned by Hoambrecker's friend, and (2) allowing black sludge discharge to enter the Cedar River. Pl. App. 97; Pl. SOF ¶ 122; Def. Resp. SOF ¶ 122.

15

Brandes had overheard Hoambrecker discussing the Nutri-Ject waste with his secretary in late November 2016, and when Hoambrecker's secretary had asked how to bill Nutri-Ject, Hoambrecker had responded, "We do that?" Pl. App. 83. Brandes did not "believe Hoambrecker had any intention of charging Nutri-Ject for this service," and he informed three city councilmembers of Hoambrecker's conflict of interest, including the one who sent the May 2017 email. Pl. App. 83. In response to the city councilmember's email, Hoambrecker provided a copy of the invoice and payment receipt from Nutri-Ject, proving that the company did pay for the waste disposal as required. *See* Pl. App. 97; *see also* Pl. SOF ¶ 124; Def. Resp. SOF ¶ 124.

With regard to the sludge, Brandes had received a picture of the potential problem from a coworker in February 2017. Pl. App. 83. Brandes showed the picture to Smith, his former supervisor who no longer worked for the City, who went to look at it. Pl. App. 175-76. Smith believed that the sludge should not be entering the river, and he contacted the Environmental Protection Agency (EPA). *Id.* Brandes did not report the sludge problem to Hoambrecker, but he did tell Brian Rath, a supervisor, who looked into it. Pl. App. 176. Brandes also told three city councilmembers about the sludge, including the one who sent the May 2017 email, who (according to Brandes) also contacted the EPA. Pl. App. 83. When the city councilmember raised the issue in May 2017, Hoambrecker explained that someone "did file a report with" the EPA about the sludge, but the "EPA and IDNR [(Iowa Department of Natural Resources)] have found the plant to be in compliance." Pl. App. 97. There is no evidence that Brandes raised the Nutri-Ject or sludge issues to Hoambrecker prior to informing city councilmembers about them, nor that Hoambrecker was aware prior to the May 2017 email that Brandes had discussed these issues with city councilmembers. Indeed, no evidence establishes Brandes reported these issues to the city councilmembers prior to May 2017.[5]

---

[5] Brandes points to an INDR inspection report from September 2017 that found the City's wastewater treatment facility in "significant noncompliance" with its National Pollutant Discharge Elimination System permit. Pl. App. 332. Specifically, Brandes notes the

Also in May 2017, the City filled the long-vacant Collections System Maintenance Supervisor position. Pl. SOF ¶ 45; Def. Resp. SOF ¶ 45. The City posted the position in December 2016 at Hoambrecker's direction. Pl. SOF ¶ 50; Def. Resp. SOF ¶ 50. Brandes applied for the position on January 29, 2017, after Hoambrecker had already determined he could not perform the duties of the CMOM Specialist position. *See* Def. SOF ¶ 22; Pl. Resp. SOF ¶ 22. Brandes was not interviewed for the position. Pl. SOF ¶ 54; Def. SOF ¶ 54. Brandes had also applied for the position when it had originally posted in 2013; at that time, Huddleston had ranked the eleven candidates' qualifications, finding Brandes "maybe" qualified; Smith, the director of the department at the time, believed Brandes was the "most qualified candidate for that position." Pl. SOF ¶¶ 46-47; Def. Resp. SOF ¶ 46-47; Pl. App. 90. Emails from June 2015 reflect that the position had not been filled in 2013 because the City wanted to hire a licensed Professional Engineer (PE), although the position remained posted on the City's website without listing that requirement. Pl. SOF ¶ 20-22; Def. Resp. SOF ¶¶ 20-22; Pl. App. 115, 317. The mayor indicated in June 2015 that he did not want to hire someone to fill the vacancy at that time. *Id.* The person eventually hired in May 2017, Michael Broadhead, was thirty-eight years old, had no disabilities, and (like Brandes) was not a licensed Professional Engineer (PE). Pl. SOF ¶¶ 56-57; Def. Resp. SOF ¶¶ 56-57.

In June 2017, Dunn (the new HR director) initiated a harassment investigation against Brandes based on complaints against him. Def. SOF ¶ 35; Pl. Resp. SOF ¶ 34.

---

report found that during the review period from April 2016 to June 2017, there were "26 effluent limit violations" and the plant exceeded the "BOD [(biological oxygen demand)] limits" fourteen out of fifteen months. Pl. 332, 338. Although this evidence may establish EPA violations by the plant generally, it does not establish the illegality of the specific issue Brandes raised to members of city council, the sludge discharge into the Cedar River. Indeed, the report noted no deficiencies in "sludge handling and disposal" other than with "final disposal, solids" (but not "final disposal, liquids"), and the section of the report discussing sludge only talks about sludge ultimately applied on fields, not sludge discharged into the Cedar River. Pl. App. 334, 340.

17

Dunn took statements from four of Brandes's coworkers during the week of June 5, 2017, during which time Hoambrecker was out of the office on vacation. Def. SOF ¶¶ 36-38, 44, 51, 53; Pl. Resp. SOF ¶¶ 35-37, 43, 50, 52; *see also* Def. App. 87, 92-95. The statements generally indicated that Brandes used vulgar or disrespectful language to describe some of his coworkers: Wolff indicated that she overheard Brandes gesturing toward her office and yelling "f***ing b****" and that Brandes walked by her office singing "the little boy and her sheep go for a walk," referring to her; two coworkers reported they heard Brandes refer to Wolff as "the little boy in the corner office" who took his job; another coworker stated Brandes called Broadhead "little boy" and Hoambrecker "homey wrecker"; and Broadhead reported Brandes called Hoambrecker "the fat little f***ing Winnie the Poo[h] at the end of the hall" and called Wolff a "f***ing c***." *Id.* Multiple statements suggest that Brandes would make comments threatening to sue the City and that he would engage in disruptive behavior, such as pounding his desk. *Id.* Multiple statements also reference an incident in which Brandes made a dunce hat out of paper and wore it around the office. *Id.* They also mention an incident where Brandes parked across three parking spots, and when cleaning staff mentioned it, he responded, "you should see what I do tomorrow"; this response, combined with his other disruptive and hostile behavior, made his coworkers feel uncomfortable. *Id.*

Although Brandes admits that he used nicknames, such as calling LaPointe "Frenchy" due to his French-sounding last name, he denies that he engaged in the vulgar name-calling mentioned by the statements. Pl. App. 83-85. He also denies engaging in disruptive or harassing behavior. *Id.* He admits wearing the dunce cap on a break as a joke. *Id.* He also admits the parking incident, but he explains that he wanted to park in the shade while he made a phone call, and he did not think it would be a problem because there were plenty of spots available and the parking lot did not have lines. *Id.* He also admits telling cleaning staff, "you should see what I do tomorrow," but explains that he

18

meant it as a joke, not a threat, because he planned to tow a trailer on his vehicle the next day. *Id.*

Following the HR investigation, on June 16, 2017, Dunn sent Brandes a pre-termination letter, setting forth the reasons why the City recommended termination of his employment. Def. SOF ¶¶ 61-64; Pl. Resp. SOF ¶¶ 60-63; Def. App. 98-99. The letter outlined Brandes's coworkers' statements about his behavior from the recent investigation. *Id.* The letter also mentioned a June 6, 2017 incident in which Brandes left a disrespectful note on Hoambrecker's desk, which stated: "ALL RIGHT YOU LIKE PLAYING GAMES!!! Well AT OVERPAID $120,000/YR I THINK YOU CAN COME UP WITH THE $15.00 YOU OWE ME FOR YOUR PART in the PIZZA." *Id.* The pre-termination letter indicates that although Brandes denied responsibility for the note, security footage showed him leaving a piece of paper in Hoambrecker's office at the time the note was left. *Id.* Brandes now admits leaving the note. Pl. Resp. SOF ¶ 63.

The pre-termination letter gave notice that a pre-termination hearing would be held on June 22, 2017. Def. App. 98-99. Brandes participated at the hearing and read a prepared statement. Def. SOF ¶ 65-66; Pl. Resp. SOF ¶ 64-65. Brandes generally stated that he felt those who filed complaints had ulterior motives or were prompted to make the complaints. Def. SOF ¶ 67; Pl. Resp. ¶ 66. He did not specifically address the allegations in the pre-termination letter, since he had already denied most of the allegations during the course of the investigation or otherwise explained his actions. *Id.* After the hearing, Brandes's employment was terminated.

Brandes brought suit against the City and Hoambrecker in October 2018, alleging violation of the FMLA, wrongful discharge in violation of public policy, age and disability discrimination in violation of the Iowa Civil Rights Act (ICRA), and intentional infliction of emotional distress. Doc. 3. Defendants removed on the basis of federal-question jurisdiction. Doc. 1. The parties consented to the exercise of jurisdiction by a

19

United States magistrate judge, and the case was assigned to me for final disposition. Doc. 7.

Defendants move for summary judgment on all Brandes's claims. Doc. 24. Brandes filed a resistance (Doc. 33), and Defendants filed a reply (Doc. 37). I held a telephonic hearing on the motion on March 24, 2020, after which Brandes filed a supplemental appendix. Docs. 39, 40.

## II.    DISCUSSION

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant [a motion for] summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." For the plaintiff to avoid summary judgment, sufficient evidence must exist "on which the jury could reasonably find for the plaintiff." *Olmsted v. Saint Paul Pub. Sch.*, 830 F.3d 824, 828 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The court "view[s] the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Soo Line R.R. Co. v. WernerEnters.*, 825 F.3d 413, 418 (8th Cir. 2016) (quoting *Bishop v. Glazier*, 723 F.3d 957, 960-61 (8th Cir. 2013)).

Brandes raises claims of FMLA discrimination and entitlement, wrongful discharge in violation of public policy, age and disability discrimination under Iowa law, intentional infliction of emotional distress, and punitive damages. I find Defendants are entitled to summary judgment on all claims.

### A. FMLA

The FMLA grants eligible employees the right to take twelve weeks of leave during a twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions" of his position. **29 U.S.C. § 2612(a)(1)(D)**. Upon return from FMLA leave, the employee is entitled to be restored to his previous

position or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." **29 U.S.C. § 2614(a)(1)**. An employee is not entitled, however, to "any right, benefit, or position of employment other than [those] to which the employee would have been entitled had the employee not taken the leave." *Id.* **§ 2614(a)(3)(B)**. With the agreement of the employer, the employee may take intermittent FMLA leave. **29 U.S.C. § 2612(b)(1)**.

Under 29 U.S.C. § 2615(a)(1), employers shall not "interfere with, restrain, or deny the exercise of" FMLA rights, and under § 2615(a)(2), employers shall not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. The Eighth Circuit clarified in 2012 that "three types of claims aris[e] under these two subsections": entitlement claims, discrimination claims, and retaliation claims. *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005-06 (8th Cir. 2012). Entitlement claims arise under § 2615(a)(1) and "occur[] where an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act," such as failing to restore an employee to his previous position or to an equivalent position. *Id.* at 1005; *see also* **Brown v. Diversified Distrib. Sys., LLC**, 801 F.3d 901, 908 (8th Cir. 2015). Eighth Circuit caselaw prior to *Pulczinski* often refers to entitlement claims as interference claims. *Pulczinski*, 691 F.3d at 1005. Discrimination claims also arise under § 2615(a)(1) and occur "when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA." *Id.* at 1006. In other words, "the employer does not prevent the employee from receiving FMLA benefits," but "[r]ather, . . . after the employee exercised his statutory rights, the employer discriminated against him in the terms and conditions of his employment." *Id.* Somewhat confusingly, Eighth Circuit caselaw prior to *Pulczinski* refers to discrimination claims as retaliation claims. *See, e.g.*, **Wierman v. Casey's Gen. Stores**, 638 F.3d 984, 999 (8th Cir. 2011). Finally, retaliation claims under § 2615(a)(2) arise when "an employee opposes [a] practice made unlawful under the FMLA" and the employer "for that reason take[s] adverse action

21

against the employee who is engaged in the opposition." *Pulczinski*, 691 F.3d at 1005-06.

Here, Brandes's complaint appears to raise just a discrimination claim: there is only one count brought under the FMLA, and it alleges that "Defendants used the taking of FMLA leave as a negative factor" when considering Plaintiff's "promotions, disciplinary actions," and termination, which "was an interference with the Plaintiff's rights" under the FMLA. Doc. 3. In their brief in support of their motion for summary judgment, Defendants addressed both entitlement and discrimination claims. *See* Doc. 24-1 at 25-28. In his resistance, Brandes primarily focuses on the discrimination claim, although he does argue in one line that "Defendants violated Plaintiff's entitlement rights under FMLA when they demoted Plaintiff to essentially his subordinate's position." Doc. 33-1 at 18. I will address both Brandes's discrimination and entitlement claims, although I note that I could perhaps decline to consider the latter claim based on Brandes's failure to raise it in his complaint. *See Pulczinski*, 691 F.3d at 1006 (holding that when the complaint did not allege interference with the plaintiff's FMLA rights based on two of the employer's actions, the "district court properly refused to consider these allegations").

### 1. Discrimination Claim

In the absence of direct evidence of discrimination, the court considers FMLA discrimination claims under the burden-shifting framework originally set forth for Title VII claims in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Pulczinski*, 691 F.3d at 1007. "To establish a *prima facie* case of FMLA discrimination, an employee must show: (1) that he engaged in activity protected under the Act, (2) that he suffered a materially adverse employment action, and (3) that a causal connection existed between the employee's action and the adverse employment action." *Id.* "Second, once the employee establishes a prima facie case, the burden shifts to the employer to artic[ulate] a legitimate, nondiscriminatory reason for its actions. Finally, the burden shifts back to

22

the employee to demonstrate that the 'employer's proffered reason is pretextual.'" ***Hite v. Vermeer Mfg. Co.***, 446 F.3d 858, 865 (8th Cir. 2006) (quoting ***Smith v. Allen Health Sys., Inc.***, 302 F.3d 827, 833 (8th Cir. 2002)).

### i.    Adverse Employment Action

The parties agree that Brandes engaged in protected activity by taking FMLA leave.   They also agree that termination constitutes an adverse employment action. Brandes suggests that Defendants took several additional adverse employment actions against him:   "investigations that were not performed against other employees, written warnings, performance improvement plans, demotion, intimidation for taking time off[,] and claims of inappropriate conduct."   Doc. 33-1 at 18-19.

In describing adverse employment actions in the context of FMLA claims, the Eighth Circuit has said:

> "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage."   "'Mere inconvenience without any decrease in title, salary, or benefits' or that results only in minor changes in working conditions does not meet this standard."

***Chappell v. Bilco Co.***, 675 F.3d 1110, 1116-17 (8th Cir. 2012) (citations omitted) (quoting ***Wedow v. City of Kansas City, Mo.***, 442 F.3d 661, 671 (8th Cir. 2006)).   The Eighth Circuit has also defined an FMLA adverse employment action as one that "'well might have dissuaded a reasonable worker from making or supporting' a claim under the FMLA."   ***Hasenwinkel v. Mosaic***, 809 F.3d 427, 433 (8th Cir. 2015) (quoting ***Burlington N. & Santa Fe Ry. Co. v. White***, 548 U.S. 53, 68 (2006) (noting "petty slights, minor annoyances, . . . lack of good manners" and other "trivial harms" will not normally constitute an adverse employment action for purposes of a Title VII retaliation claim)).   The Eighth Circuit has noted, however, that the "FMLA limits damages to actual monetary loss" (unlike Title VII) and thus held that an unpaid suspension for which the employer is later provided backpay does not constitute an adverse employment action unless the plaintiff "present[s] evidence of . . . tangible loss actually incurred and directly

23

caused by [the unpaid] suspension"—general arguments that "missing a paycheck can often spell disaster for employees" are not enough. *Id.* at 434 (cleaned up).

Most of the conduct Brandes complains of fails to meet this standard. Being investigated and "intimidated" are not employment actions resulting in "tangible harm," and being complained about by his coworkers for "inappropriate conduct" was not an action taken by his employer. *Cf. Pulczinski*, 691 F.3d at 1007-08 (paid suspension while employer investigated plaintiff's absences did not constitute adverse employment action for purposes of FMLA); *Littleton v. Pilot Travel Centers, LLC*, 568 F.3d 641, 644 (8th Cir. 2009) (noting that "commencing performance evaluations, or sending a critical letter that threatened 'appropriate disciplinary action,' or falsely reporting poor performance" do not constitute adverse employment actions under *Burlington Northern* for purposes of a Title VII retaliation claim "absent showings of materially adverse consequences to the employee"). Neither does placement on a performance improvement plan, without more, amount to an adverse employment action for purposes of the FMLA. *See Cole v. Illinois*, 562 F.3d 812, 816–18 (7th Cir. 2009) (placement on performance improvement plan that required plaintiff to prepare daily schedules but did not deprive plaintiff of "responsibility, hours, pay, or any other relevant accoutrement of her position" did not constitute adverse employment action for purposes of FMLA (citing *Givens v. Cingular Wireless*, 396 F.3d 998, 998 (8th Cir. 2005) (per curiam) (holding that placing plaintiff "on a 'performance improvement plan,' without more, did not constitute an adverse employment action" for purposes of Title VII retaliation claim))); *see also Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 428-29 (4th Cir. 2015) (holding that "written [and] verbal reprimands [did not] qualify as adverse employment actions" for purposes of FMLA when "they did not lead to further discipline").

Brandes's placement on the Performance Improvement Plan in November 2016 did result in a one-week unpaid suspension, causing tangible monetary loss. I find that the one-week unpaid suspension constituted an adverse employment action (although Brandes does not specifically argue that the unpaid suspension constitutes an adverse

employment action, I find that his argument related to the Performance Improvement Plan sufficiently raised this issue).

Whether Brandes's "demotion" in January 2017 constitutes an adverse employment action presents a close issue. As Defendants note, Brandes's title of "CMOM Specialist" technically remained the same, as did his salary and benefits. But Brandes was told he would no longer be performing the duties of the CMOM Specialist, and it was readily understood by people in the office that Brandes's subordinate Wolff took over his position and started overseeing Brandes, rather than the other way around. Although there was no decrease in Brandes's title (technically), salary, or benefits, Brandes's job duties completely changed and his subordinate became his supervisor, amounting to more than a "minor change." The "demotion" in duties and status certainly seems like an action that could dissuade a reasonable worker from taking FMLA leave. On the other hand, Brandes does not appear to have suffered any monetary loss as a result of the demotion. Ultimately, I decline to decide whether the demotion constituted an adverse employment action—I will assume that it did.

### ii.    Discriminatory Intent

Defendants argue that Brandes cannot establish a causal link between the adverse employment actions (unpaid suspension in November 2016, demotion in January 2017, and termination in June 2017) and taking FMLA leave. "To establish a causal link between the employee's exercise of FMLA rights and her termination, the employee must prove 'that an employer's "retaliatory motive played a part in the adverse employment action."'" *Hite*, 446 F.3d at 865 (quoting ***Kipp v. Mo. Highway & Transp. Comm'n.***, 280 F.3d 893, 897 (8th Cir. 2002)). To establish causation, Brandes relies primarily on the temporal proximity between disciplinary actions taken against him and exercising his rights under the FMLA, as well as statements Hoambrecker made in April 2017 about his absences.

25

"Though temporal proximity between the use of leave and termination may establish a causal link between the two events, such proximity is 'rarely' sufficient by itself, unless the time relation is 'extremely close.'" *Lovelace v. Wash. Univ. Sch. of Med.*, 931 F.3d 698, 706 (8th Cir. 2019) (quoting *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014); *Kipp*, 280 F.3d at 897). Here, Brandes first requested FMLA leave in early August 2016, three months before he was suspended without pay; five months before he was demoted; and ten months before his termination. *See Sisk v. Picture People, Inc.*, 669 F.3d 896, 900-01 n.2 (8th Cir. 2012) (analyzing temporal proximity between employee's request for FMLA leave and adverse employment action). The Eighth Circuit has held "that a one-month or two-month lag is too long absent other evidence." *Ebersole*, 758 F.3d at 925. But Brandes points to additional evidence "shortening" the temporal-proximity gap. Hoambrecker first discussed placing Brandes on a PIP when Brandes took FMLA leave for the first time, and Brandes was placed on the September PIP the day he returned from work after first taking FMLA leave. *See Smith*, 302 F.3d at 832-33 (noting that a pattern of disciplinary measures after taking FMLA leave "can supply the extra quantum of evidence to satisfy the causation requirement"). Hoambrecker also suggested in an email at the end of October 2016 that he wanted to replace Brandes with a new hire and that to avoid legal issues in firing Brandes, he would continue with the PIP process—supporting that Hoambrecker planned to fire Brandes as early as October 2016, about two months after Brandes first took FMLA leave. Undercutting the significance of the temporal proximity of these events, however, is evidence that Hoambrecker was concerned with Brandes's job performance in June 2016, prior to his request for FMLA leave: Brandes's interim supervisor LaPointe relayed concerns about Brandes's job performance to Hoambrecker when Hoambrecker started; Hoambrecker first raised issues with Brandes's job performance at a meeting in June 2016 at which Hoambrecker discussed his expectations and Brandes's job duties going forward; and Brandes felt Hoambrecker was "hostile and abusive" to him from the moment Hoambrecker became Brandes's supervisor. *See id.* at 834

26

("Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity."). A September 1, 2016 email from Huddleston to Hoambrecker further supports early concerns about Brandes unrelated to his FMLA leave: Huddleston noted she needed "to tread lightly when requesting additional medical support for Brandes's FMLA request given "everything else going on with [Brandes]." Pl. Supp. App. 39.

Brandes also points to evidence that Hoambrecker was frustrated with his use of FMLA leave. Hoambrecker held a meeting with Brandes on April 12, 2017, after Brandes returned to work for the first time after taking at least two weeks of FMLA leave. At that time, since his demotion on January 23, 2017, Brandes had worked nineteen days and taken thirty-seven days off, much of that covered by both FMLA leave and paid absences. *See* Pl. App. 165-66. At the meeting, Hoambrecker stated in an angry tone of voice that he had not set up a workstation for Brandes because he did not know whether Brandes would ever return to work, since Brandes had been texting Hoambrecker each morning that he was staying home without ever stating when he planned to return. Hoambrecker also suggested that for Brandes to effectively do his job, Hoambrecker had "to have him here." Hoambrecker indicated that although Brandes had told him his first day off related to his medical issues, Brandes provided no explanation for subsequent absences, so Hoambrecker had no way to know whether Brandes was absent for medical reasons and when he would return.

I decline to decide whether this additional evidence is sufficient (in combination with the temporal-proximity evidence) to establish causation. Even if Brandes can establish a prima facie case that termination, demotion, and unpaid suspension were the result of discrimination, Brandes cannot establish the City's proffered reasons for the adverse employment actions taken against him were pretextual. Defendants offered legitimate, nondiscriminatory reasons for the actions taken against Brandes—poor performance (with regard to the unpaid suspension and demotion) and increasingly disrespectful and disruptive behavior (with regard to termination).

27

Thus, Brandes must "create[] a question of fact regarding whether [Defendants']
reason was pretextual." *Hite*, 446 F.3d at 865 (quoting *McDonnell Douglas*, 411 U.S.
at 833). "[Brandes's] burden to show pretext 'merges with the ultimate burden of
persuading the court that [he was] the victim of intentional discrimination.'" *Torgerson
v. City of Rochester*, 643 F.3d 1031, 1046 (8th Cir. 2011) (en banc) (quoting *Texas
Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)) (Title VII case).

> An employee may prove pretext in two ways:
>
> "First, a plaintiff may succeed 'indirectly by showing that the employer's
> proffered explanation is unworthy of credence.'" Under this method, the
> employee must rebut the employer's "underlying factual claims" by
> establishing that the employer's explanation has no basis in fact.
>
> Second, the plaintiff may prove pretext "'directly by persuading the court
> that a [prohibited] reason more likely motivated the employer.'" Under
> this method, the employee rebuts "the employer's ultimate factual claim
> regarding the absence of retaliatory intent." The employee must
> demonstrate "that sufficient evidence of intentional retaliation exists for a
> jury to believe the plaintiff's allegations and find that the proffered
> explanation was not the true motivating explanation." Thus, the employee
> "may concede that the proffered reason for the termination[] *would have
> been* a sufficient basis for the adverse action while arguing that the
> employer's proffered reason was not the true reason for the action."

*Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006) (first alteration in
original) (citations omitted) (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112,
1120-21 (8th Cir. 2006)). Oft-used evidence of pretext includes "that the employee
received a favorable review shortly before he was terminated, that similarly situated
employees who did not engage in the protected activity were treated more leniently, that
the employer changed its explanation for why it fired the employee, or that the employer
deviated from its policies." *Id.* "An employee's attempt to prove pretext or actual
discrimination requires more substantial evidence [than it takes to make a prima facie
case] . . . because . . . evidence of pretext and discrimination is viewed in light of the
employer's justification." *Smith*, 302 F.3d at 834 (alteration in original) (quoting

*Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001)).

To prove pretext, Brandes relies on the temporal-proximity evidence and statements made by Hoambrecker that he argued established causation. This evidence is insufficient to establish pretext. *See Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1160-61, 1163 (8th Cir. 2016) (holding that plaintiff could not prove defendant's reason for terminating her—untimely charting—was pretext for FMLA discrimination when plaintiff relied on employer's "inquiries and requests" that she return to work from FMLA leave and statements expressing "frustration" at understaffing, as well as temporal proximity between FMLA leave and termination, the significance of which was undercut by employer's raising untimely-charting problem months prior to plaintiff's FMLA request). Brandes also suggests that there is no factual basis for Defendants' stated reasons for the adverse employment actions. Defendants terminated Brandes's employment after an HR investigation the week of June 5, 2017, initiated after coworkers complained about Brandes's behavior. Dunn, the HR director, took statements from four of Brandes's coworkers reflecting that Brandes referred to Hoambrecker, Wolff, and Broadhead using vulgar or disrespectful language; that he engaged in disruptive behavior, such as pounding his desk when Wolff was on the phone; that he walked around wearing a dunce cap one day; and that he parked in the parking lot taking up multiple spaces. Brandes does not deny the dunce-cap or parking-lot incidents, but he argues that these incidents are so trivial, they could not have been the true motive for his termination. Brandes also argues that he did not use vulgar language or engage in disruptive behavior, pointing to his affidavit.

> [Brandes's] argument misunderstands what it means to prove the falsity of the employer's explanation. If an employer, in explaining a termination, says it believed that the employee violated company rules, then proof that the employee never violated company rules does not show that the employer's explanation was false. That proof shows only that the employer's belief was mistaken. To prove that the employer's explanation

was false, the employee must show the employer did not truly believe that the employee violated company rules.

*Pulczinski*, 691 F.3d at 1003, 1007; *accord* **Main v. Ozark Health, Inc.**, 959 F.3d 319 (8th Cir. 2020) (holding in reliance on *Pulczinski* that plaintiff's "own testimony and the testimony of others that she was not rude or inappropriate" at a meeting was insufficient to show whether "the decisionmaker[] truly believed that [plaintiff's] behavior at the meeting was rude or inappropriate" and that therefore, the plaintiff could not demonstrate pretext for age and sex discrimination claims). Brandes does not dispute that his coworkers complained about his behavior and made statements to HR. He suggests in argument that Hoambrecker coerced his coworkers into making statements about him in order to have grounds to fire him, but this appears to be a baseless accusation without any evidence to support it. Although true that an email indicates Hoambrecker had been contemplating terminating Brandes since at least October 2016, that same email suggests the reason Hoambrecker wanted to terminate Brandes related to his job performance. Brandes cannot establish that Defendants' proffered reasons for terminating him were mere pretext for FMLA discrimination.

Brandes also disputes that his performance warranted the unpaid suspension in November 2016 and demotion in January 2017. The November PIP indicated that Brandes's unpaid suspension was the result of poor performance—specifically, that Brandes had not worked on issues related to smoke testing or the private-sewer ordinance, that he had failed to use a white board he had requested the City purchase, and that he had not provided timely responses to Wolff and Hoambrecker on several occasions. Brandes argues that the issues with his performance identified by the November PIP lack a basis in fact. Brandes notes that the smoke-testing letters were completed by Wolff (as reflected by the September PIP). But the September PIP noted that the letters were just an "initial" task related to the issue of smoke testing. Def. App. 53. Although the September PIP did not set forth additional actions for Brandes to take regarding smoke testing, the November PIP noted as "part of this process," Brandes was to "follow-up

and work to insure compliance," which he failed to do. Def. App. 56. Brandes does not dispute that he did not take any additional action on smoke testing.

Similarly, the November PIP indicated that Brandes had not worked on a plan to solve issues with the private-sewer ordinance. Brandes argues that he had already created a draft private-sewer ordinance at the time of the November PIP. The issue with the private-sewer ordinance identified by the September PIP was that when Hoambrecker emailed Brandes to ask for an update (recognizing that the task list indicated a draft ordinance had been completed), Brandes responded that the task should be removed from the list and that it was unimportant. Thus, although the evidence supports Brandes's contention that he had already drafted a private-sewer ordinance at the time of the November PIP (and that the ordinance was not of high importance, since it has still not been enacted), Brandes does not dispute that he failed to work further on the ordinance as set forth in the November PIP.

The November PIP also indicated that Brandes's unpaid suspension related in part to his failure to use a white board he had requested. Brandes argues that the white board had been purchased for use in his Collections System Maintenance Supervisor duties and that he had not used the white board because he was no longer performing that role. A memorandum from Hoambrecker in December 2016, however, indicated that at the time, Brandes responded that the white board "was for all of the CMOM team to be able to add and see what projects were upcoming." Def. App. 65. In response in the memo, Hoambrecker indicated Brandes was "not effectively using [the whiteboard] for that reason" and concluded "[t]his is a very minor issue" that was "noted in part to provide an example of ineffective job performance," but "[i]t is not a primary issue with [Brandes's] job performance and does not need to be further addressed." *Id.* Brandes suggests that because Hoambrecker recognized that the whiteboard issue was minor, it supports that it was a pretextual reason for his unpaid suspension. I disagree. Hoambrecker explained why the white board was included in the November PIP, despite being "minor." In any event, it was one issue among many.

31

The evidence cited by Brandes does not support that the issues with his job performance identified by the November 2016 PIP lack a factual basis. In addition, Brandes does not dispute that he failed to timely respond to requests made by Wolff and Hoambrecker on October 24 and 26, 2016, despite being in the office (additional issues identified by the November PIP). Brandes cannot prove that Defendants' proffered reasons for suspending him were pretextual.

The issues with Brandes's job performance culminated in his demotion in January 2017. Brandes does not dispute that Hoambrecker occasionally had to obtain information from Wolff—one of Hoambrecker's (and LaPointe's) main issues with Brandes's job performance—but points to his frequent absences and Wolff's job description, which indicated she would provide coverage for Brandes's position when he was gone. But this argument does not address Brandes's failure to provide information and respond to emails when he was in the office. *See* Def. App. 57; Pl. App. 161; Def. Supp. App. 102-104. Brandes does not offer evidence establishing that Defendants' reasons for his demotion in January 2017 were pretextual.

The evidence establishes that Defendants took adverse employment actions against Brandes based on his job performance and reports of his disruptive and rude behavior. The evidence relied upon by Brandes does not establish that Defendants acted with discriminatory intent. Accordingly, I find that Defendants are entitled to summary judgment on Brandes's FMLA discrimination claim.

### 2. Entitlement Claim

Brandes argues that "Defendants violated Plaintiff's entitlement rights under [the] FMLA when they demoted Plaintiff to essentially his subordinate's position." Doc. 33-1 at 18.

> To prevail on an [entitlement] claim, an employee must show she was (1) entitled to a benefit under the FMLA, (2) the employer "interfered with" that entitlement, and (3) the reason for the denial was connected to the employee's FMLA leave. "Even if successful on this front, a claim for

32

interference will fail unless the employee also shows that the employer's interference prejudiced the employee as the result of a real, remediable impairment of her rights under the FMLA."

***Thompson v. Kanabec Cnty.***, 958 F.3d 698, 705-06 (8th Cir. 2020) (citations omitted) (quoting ***Massey-Diez***, 826 F.3d at 1160). Although "the employer's intent is immaterial" for purposes of an entitlement claim, "the FMLA does not impose strict liability on employers," and an entitlement claim fails if the employer would have taken the same action "had the employee not exercised FMLA rights." ***Ballato v. Comcast Corp.***, 676 F.3d 768, 772 (8th Cir. 2012).

At least one district court in the Eighth Circuit has recognized that an FMLA entitlement claim may be based on an employee's change in duties upon his return from FMLA leave, even if the employee's title, benefits, and salary remain the same. *See* ***Haskell v. CentraCare Health Sys.—Long Prairie***, 952 F. Supp. 2d 838, 845 (D. Minn. 2013). But here, Brandes's use of intermittent leave complicates matters. Upon his first use of FMLA leave in late August and early September 2016, he was "restored" to his position and had no change in duties. Throughout the rest of 2016, Brandes continued to miss work intermittently for his medical condition, and upon each use of FMLA leave, he was "restored" to the position he had prior to using leave. In January 2017, he took paid vacation time from January 13 to January 20, 2017, and it was upon his return to work on Monday, January 23, 2017, that he was demoted. *See* Pl. App. 163. It is not clear whether Brandes's time off from January 13 to January 20 related to the FMLA—Huddleston counted any paid time off as FMLA leave when the City had information that Brandes's absence was to visit the Mayo Clinic or otherwise related to his health condition. In discovery, Brandes requested a list of the specific dates Huddleston had counted as FMLA leave, but it was not provided.[6]

---

[6] Defendants absolutely should have provided this information, but on the other hand, the court should not be hearing about a discovery dispute for the first time in a summary-judgment

33

Even if Brandes's time off from January 13 to January 20 was covered by the FMLA such that Defendants' failure to restore Brandes to his position upon his return to work on January 23 could constitute interference with Brandes's FMLA rights,[7] Defendants are still entitled to summary judgment on Brandes's entitlement claim. First, as discussed in relation to Brandes's discrimination claim, the evidence establishes that Defendants would have demoted Brandes even if he had not exercised his rights under the FMLA. Second, Brandes cannot demonstrate any "remediable" harm. His pay and benefits remained the same upon his demotion in duties, and he offers no evidence of other monetary loss caused by the demotion. *See* **29 U.S.C. § 2617(c)(1)(A)** (FMLA authorizes damages for "any wages, salary, employment benefits, or other compensation denied or lost . . . by reason of the violation" or any other "actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care"); *see also* **Hasenwinkel**, 809 F.3d at 434 (when analyzing FMLA discrimination claim, noting "a plaintiff proceeding under the FMLA must show actual monetary loss to recover" and that "[t]he FMLA 'provides no relief unless the employee has been prejudiced by the violation'" (quoting **Ragsdale v. Wolverine World Wide, Inc.**, 535 U.S. 81, 89 (2002))). The FMLA does authorize appropriate equitable relief, "such as employment, reinstatement, and promotion," **29 U.S.C. § 2617(a)(1)(B)**, but here, as discussed above, Brandes was ultimately terminated for engaging in disruptive behavior and using vulgar names to describe his coworkers. Therefore, reinstatement and promotion would not be an appropriate remedy, and indeed, the complaint does not request such a remedy. *See* Doc. 1 at 12.

_____

resistance—Plaintiff should have met and conferred with Defendants to obtain this information and filed a motion to compel if necessary.

[7] An employer may require an employee taking intermittent leave "transfer temporarily to an available alternative position . . . that . . . has equivalent pay and benefits[] and . . . better accommodates recurring periods of leave," **29 U.S.C. § 2612(b)(2)**, but Brandes's change in duties was a permanent, not temporary, change.

Brandes also suggests that Defendants interfered with his rights under the FMLA by miscalculating his FMLA leave, approving his FMLA leave retroactively (in November 2016, after originally denying his request for failure to provide proper medical certification), and counting paid time off as FMLA leave. Although the propriety of some of these actions is questionable, Brandes cannot establish prejudice. He argues the City's actions resulted in an earlier depletion of his FMLA-leave than he was otherwise entitled, but there is no evidence that Brandes ran out of FMLA leave or was otherwise denied FMLA leave. Thus, Defendants' actions resulting in a miscalculation of Brandes's FMLA leave cannot form the basis of his entitlement claim. *See Walker v. Trinity Marine Prods., Inc.*, 721 F.3d 542, 544-45 (8th Cir. 2013) (holding that "if forced leave can amount to interference with a right provided under the FMLA," such a claim "ripens only when and if the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully forced to use FMLA leave in the past" (quoting *Wysong v. Dow Chem. Co.,* 503 F.3d 441, 449 (6th Cir. 2007))).

Accordingly, I find that Defendants are entitled to summary judgment on Brandes's FMLA entitlement claim.

### B. Wrongful Discharge in Violation of Public Policy[8]

Under Iowa law, a claim of wrongful discharge in violation of public policy has the following elements:

> (1) the existence of a clearly defined and well-recognized public policy that protects the employee's activity; (2) this public policy would be undermined

---

[8] I agree with Defendants that Brandes's complaint raises only a claim for common-law wrongful discharge in violation of public policy, and not a claim under the Iowa whistleblower statute for municipal employees (Iowa Code section 70A.29). The complaint labels the claim "wrongful discharge – violation of public policy"; it does not cite the statute; and the allegations in the complaint supporting the claim are consistent with alleging a claim of wrongful discharge in violation of public policy—they do not "mirror" the statutory language, as Brandes argues. *Compare* Doc. 3 (complaint alleges that Brandes "engaged in a statutorily protected activity," that the City "terminated [him] because he was engaged in statutorily protected activities," and that "said termination is against public policy"), *with* Iowa Code § 70A.29(1) (providing

by the employee's discharge from employment; [and] (3) the employee engaged in the protected activity, and this conduct was the reason the employer discharged the employee . . . .

*Ferguson v. Exide Techs., Inc.*, 936 N.W.2d 429, 432 (Iowa 2019); *see also* *Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 898-99 (Iowa 2015). Brandes argues that he was terminated for acting as a whistleblower and reporting violations of the Clean Water Act to members of the city council. Specifically, Brandes argues that he was terminated for telling city council members about an illegal discharge into the Cedar River and about Hoambrecker accepting waste from Nutri-Ject without charge.

Brandes received a picture of sludge entering the Cedar River in February 2017 from a coworker. Part of Brandes's duties as the CMOM Specialist had been ensuring the City's compliance with an EPA consent decree, and Brandes believed the sludge discharge likely violated the consent decree and the Clean Water Act. Rather than telling Hoambrecker about it—the head of the department responsible for ensuring the City's compliance with the consent decree and the Clean Water Act—Brandes reached out to his former boss, who went to look at the discharge and reported it to the EPA. Brandes also told another supervisor about the discharge. The EPA and the IDNR determined that the sludge discharge was not unlawful. It does not appear that Brandes told members of the

protection if a municipal "employee, in good faith, reasonably believes the information [disclosed] evidences a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety"). Brandes cannot now assert a claim under Iowa Code section 70A.29 based on reporting Hoambrecker's "mismanagement" in response to Defendants' summary-judgment argument that Brandes's common-law claim is preempted by the statute. *See Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004) ("Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint."); *Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."); *New Colt Holding Corp. v. RJG Holdings of Fla., Inc.*, No. Civ.3:02CV173(PCD), 2003 WL 23507022, at *3 (D. Conn. May 8, 2003) (noting a "summary judgment motion" may "not be defeated by [a] claim not raised in [the] complaint" (citing *Miller v. United States*, 67 F.R.D. 486, 491 (D.D.C. 1975)).

city council about the waste discharge until May 2017, when Brandes believed he was about to be terminated. When a city council member confronted Hoambrecker about the "illegal" discharge, Hoambrecker explained that the EPA had been alerted about the issue and that the plant had been found to be in compliance.

Similarly, Brandes learned about the Nutri-Ject issue in November 2016 when he overheard a conversation between Hoambrecker and his secretary. No evidence establishes that Brandes raised this issue before May 2017, when he told a member of city council that Hoambrecker accepted discharge from his friend's company without payment as required. When a city council member raised this issue with Hoambrecker, he provided the receipt showing Nutri-Ject had paid for the waste disposal.

Brandes argues that his report of a violation of the Clean Water Act to a member of city council should be protected as a matter of public policy. I doubt that under the circumstances here, Brandes's actions meet the public-policy exception. But I need not definitively resolve whether Brandes can prove the first element of a wrongful-discharge claim, because he cannot establish causation.

"[T]o prevail on a wrongful discharge claim in violation of public policy, the plaintiff must show the protected conduct was the determining factor in the adverse employment action." *Rivera*, 865 N.W.2d at 898. "[A] determining factor is one that tips the balance in an employment decision"; the protected conduct need not be "'the main reason behind the decision,' but it must be the factor that makes the difference in the employment outcome." *Id.* (quoting *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 686 (Iowa 1990)). "[T]he existence of other legal reasons or motives for the termination are relevant," but not dispositive, "in considering causation." *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 289 (Iowa 2000); *see Rivera*, 865 N.W.2d at 899.

Here, there is no evidence that Brandes's reports to city council members in early May 2017 led to his termination in June 2017, other than the temporal proximity between the two events. The Iowa Supreme Court has held that "the timing between the protected

37

activity and the discharge is insufficient, by itself, to support the causation element of the tort." ***Jasper v. H. Nizam, Inc.***, 764 N.W.2d 751, 768 (Iowa 2009); *see also* ***Strehlow v. Marshalltown Cmty. Sch. Dist.***, 275 F. Supp. 3d 1006, 1022-23 (S.D. Iowa 2017). There is insufficient evidence to generate a genuine dispute of material fact that Brandes's complaints to city council caused his discharge. Accordingly, Defendants are entitled to summary judgment on Brandes's claim of wrongful discharge in violation of public policy.[9]

### C. Age Discrimination Under Iowa Law

The parties agree that in the absence of direct evidence of age discrimination, the *McDonnell Douglas* burden-shifting framework applies at summary judgment to Brandes's age-discrimination claim under the ICRA, Iowa Code section 216.6(1)(a). *Cf.* ***Hedlund v. State***, 930 N.W.2d 707, 719 & n.8 (Iowa 2019). Brandes argues that his demotion in January 2017 and termination in June 2017 were the result of age discrimination. Brandes also argues that Defendants failed to promote him to the position of Collections Systems Maintenance Supervisor because of his age.

The only evidence of age discrimination offered by Brandes is that he was replaced by younger individuals. Upon his demotion, his duties were taken over by Wolff, and upon his termination, Wolff and another coworker were promoted. Brandes was 57 at the time of his termination, and Wolff and the other coworker were some twenty years younger. "Generally, evidence that a younger person replaced the plaintiff's position is insufficient to create a reasonable inference of age discrimination." ***Hedlund***, 930

---

[9] Defendants also argue that Brandes's claims are precluded by Iowa Code section 70A.29, an issue recently left open by the Iowa Supreme Court and that I decline to decide. *See* ***Ackerman v. State***, 913 N.W.2d 610, 622 (Iowa 2018) (declining to address the "preclusive effect, if any," of Iowa code section 70A.28—a parallel statute to section 70A.29, governing state, rather than municipal, employees—on state employee's claim of wrongful discharge in violation of public policy).

N.W.2d at 722. As discussed above in relation to Brandes's FMLA claim, Defendants offered legitimate, nondiscriminatory reasons for demoting and terminating Brandes's employment, and Brandes has not offered sufficient evidence establishing that these reasons were a pretext for age discrimination.

Brandes also argues that the failure to promote him to the position of Collections System Maintenance Supervisor was the result of his age. Brandes originally applied for the position in 2013, along with ten other applicants. Huddleston rated one of the applicants as "qualified," four as "maybe" qualified (including Brandes), and six as "not qualified." Pl. App. 284-85. There is no information in the record about the applicants' ages. The City did not hire anyone at that time, and the position remained vacant until May 2017. The position did not require a PE license—obtainable by a person with a bachelor's degree in engineering—but emails from the City in 2015 indicated that the City wanted a person with a PE license to fill the position (and that the position remained listed as open on the City's website and did not state a PE license was required). In December 2016, Hoambrecker obtained approval from city council to re-post the vacancy, and Brandes applied in January 2017, after he had already been demoted. He was not interviewed. Ultimately, the person hired in May 2017 did not have a PE license and was considerably younger than Brandes at thirty-eight. Another person was hired for the position in 2020, a thirty-three-year-old with a PE license.[10]

The City argues that Brandes was not hired for the position of Collections System Maintenance Supervisor in 2017 because of his poor job performance, pointing to the PIPs and Brandes's demotion. Brandes offers no evidence of pretext other than that a younger individual was ultimately hired for the position, but as already discussed, such evidence is insufficient to create a genuine dispute of material fact on pretext. To the extent Brandes argues the relevance of a younger individual being hired in 2020, Brandes

---

[10] Defendants object to this fact because Brandes never disclosed it in discovery. I consider this information because it does not change the outcome.

did not re-apply for the position in 2020; Brandes and the individual hired were not similarly qualified, since the person hired had a PE license; and pointing to one additional younger individual hired by the City in the waste management department does not establish a pattern of hiring younger individuals, especially since both Hoambrecker and LaPointe, Brandes's supervisors hired by the City in 2015 and 2016, were older than Brandes. *See Hy-Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n*, 453 N.W.2d 512, 516 (Iowa 1990) (that the plaintiff applied for the position and that the employer continued to seek "applicants with similar qualifications" are both elements of a prima facie case of failure-to-promote based on age discrimination under the ICRA).

Brandes focuses his argument on the City's failure to promote him to the position of Collections System Maintenance Supervisor in 2013. As an initial matter, it does not seem that Brandes's complaint raised this claim. *See* Doc. 3. In any event, Brandes cannot establish a prima facie case of failure to promote based on age discrimination in 2013. A necessary element of the claim is that after the employee was rejected for the position, "the position remained open and the employer continued to seek applicants with similar qualifications." *Hy-Vee Food*, 453 N.W.2d at 516. Although there is an email in the record from 2015 indicating that the position remained listed on the City's website, that same email indicates that the City wanted to hire a person with a PE license. Therefore, no evidence establishes that after the City decided not to hire Brandes in 2013, the City continued to seek applicants with similar qualifications to Brandes. Furthermore, by the time Hoambrecker decided to fill the vacant position in December 2016, he had to obtain approval from city council, suggesting that the position had not remained open that whole time (and that the failure to promote in 2013 should be analyzed separately from the failure to promote in 2017).

Viewing the evidence in the light most favorable to Brandes, Brandes cannot establish an age discrimination claim under the ICRA. Accordingly, Defendants are entitled to summary judgment on this claim.

40

### D. Disability Discrimination Under Iowa Law[11]

In addition to prohibiting discrimination based on age, the ICRA prohibits discrimination based on disability. *See* **Iowa Code § 216.6(1)(a)**. Brandes suggests that he was terminated because of his disabilities—namely, the back impairment and mental-health issues that resulted in him taking FMLA leave.

> To prevail on a disability discrimination claim under the ICRA, [the plaintiff] must initially prove a prima facie case by showing: (1) he has a disability, (2) he is qualified to perform the essential functions of the . . . position, and (3) the circumstances of his termination raise an inference of illegal discrimination.

*Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 6 (Iowa 2014). If the employer's proffered reason for terminating the employee does not relate to disability and there is no direct evidence of discrimination (as here), the *McDonnell Douglas* framework applies: the employer must prove a legitimate, nondiscriminatory reason for the employee's termination, and then the employee must prove that the employer's proffered reason "was merely a pretext for intentional discrimination" based on disability. *Fitzgerald v. Hy-Vee, Inc.*, No. 16-0462, 2017 WL 936121, at *7 (Iowa Ct. App. Mar. 8, 2017). Brandes's wrongful-termination claim based on disability fails for the same reason that his FMLA discrimination claim fails: Brandes cannot prove that Defendants' proffered reasons for his termination were pretextual.

Brandes focuses his disability-discrimination argument on a failure to accommodate and engage in the interactive process. When a plaintiff gives notice of his disability and requests an accommodation, the employer must engage in the interactive process to see if a reasonable accommodation exists. *See Slaughter v. Des Moines Univ. Coll. of Osteopathic Med.*, 925 N.W.2d 793, 805 (Iowa 2019).

> [T]o show that an employer failed to participate in the interactive process, an employee must show that: (1) the employer knew of the employee's disability; (2)

---

[11] In his resistance, Brandes refers to his claim as one under the Americans with Disabilities Act (ADA), but his complaint cites the ICRA, not the ADA. *See* Doc. 3.

the employee requested accommodations or assistance; (3) the employer did not in good faith assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Id.* at 805-06 (quoting *Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 933 (8th Cir. 2012)).

Brandes argues that Defendants were on notice of his disability since he injured his back in 2004 in a workplace accident that ultimately resulted in a favorable worker's compensation settlement. He also argues that his FMLA paperwork related to his back impairment in August 2016, and his FMLA paperwork related to his anxiety and depression in April 2017, also put Defendants on notice of his disability. But knowledge of an employee's disability, standing alone, is not enough to trigger the interactive process: "the employer must know of both the disability and the employee's desire for accommodations for that disability." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313-15 (3d Cir. 1999) (Americans with Disabilities Act (ADA) case) (favorably cited in *Deeds v. City of Marion*, 914 N.W.2d 330, 341 (Iowa 2018)); *accord Kowitz v. Trinity Health*, 839 F.3d 742, 748 (8th Cir. 2016) (ADA case); *see also Slaughter*, 925 N.W.2d at 805.

Brandes argues that he requested an accommodation during a meeting with Hoambrecker and HR on March 20, 2017. Hoambrecker called the meeting to discuss Brandes's presence at the plant over the weekend and to question his use of a City-owned vehicle. Brandes explained, "Since I've been on vacation and you've got deadlines due for me, I'm trying to make sure that everything you've asked for is complied with." When the HR representative indicated they were concerned about Brandes working overtime without authorization, Brandes said that if he took sick leave for eight hours during the week and then came in during the weekend for eight hours, he would not be entitled to overtime. Hoambrecker told Brandes that he did not want him working on weekends going forward.

42

Brandes argues that although he used the word "vacation" during this meeting, Hoambrecker and the HR representative knew that Brandes had been missing work due to his back impairment and using paid vacation to cover his FMLA absences. Thus, Brandes argues that he requested the ability to work on weekends as an accommodation and that Defendants failed to engage in the interactive process. A request for an accommodation need not be in writing, and an employee "may use 'plain English'" without mentioning the ICRA or using the phrase "reasonable accommodation." *Taylor*, 184 F.3d at 313. Neither must the employee "suggest what accommodation might be appropriate" to trigger the interactive process. *Kowitz*, 839 F.3d at 746. Nonetheless, the employee's "notice . . . must make clear that the employee wants assistance for his or her disability." *Taylor*, 184 F.3d at 313.

Here, nothing Brandes said during the March 20 meeting makes it clear that he was requesting to be able to work on weekends or that working on weekends would accommodate his disability. Brandes relies on a case in which the Eighth Circuit held that a jury could find the plaintiff requested an accommodation when the plaintiff "repeatedly inquired about a leave of absence to deal" with her medical conditions. *Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 941-42 (8th Cir. 2019) (ADA case). Here, unlike in *Garrison*, Brandes did not ask for a specific accommodation to deal with his medical condition; rather, he explained when confronted *why* he had been working on a weekend (and related it to his work absences, both "sick leave" and "vacation"). "The employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it." *Deeds*, 914 N.W.2d at 341 (quoting *Schmidt v. Safeway, Inc.*, 864 F. Supp. 991, 997 (D. Or. 1994)). No reasonable juror could find that Brandes's statements at the March 20 meeting amounted to a request for an accommodation. *See Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 159, 165 (5th Cir. 1996) (favorably cited by the Iowa Supreme Court in *Deeds*) (holding that plaintiff's statements were "too indefinite and ambiguous" to constitute a request for an accommodation under the ADA when, at a meeting called by

43

his supervisor to address his poor performance, the plaintiff indicated he suffered from bipolar disorder and requested a "reduction in his 'objectives' and lessening of the 'pressure'"; the supervisor agreed to extend the time for plaintiff to complete his objectives; and the next day, the plaintiff emailed his supervisor "optimistically indicat[ing] that he can meet the job requirements" as discussed at the meeting, nowhere mentioning his "bipolar disorder, any limitations resulting therefrom, or the need for any specific accommodations"); *cf. Kowitz*, 839 F.3d at 747 (holding that a genuine issue of material fact existed whether plaintiff requested an accommodation when plaintiff had taken FMLA leave for neck surgery and returned to work with physical restrictions per a doctor's orders, notified her employer that she could not complete the physical component of her life-support certification until cleared by a doctor, and later stated her doctor said she needed four more months of physical therapy before obtaining the certification); *Schmidt*, 864 F. Supp. at 997 (favorably cited by the Iowa Supreme Court in *Deeds*) (sufficient evidence of request for accommodation when defendant knew that plaintiff had an alcohol problem, that plaintiff's doctor recommended a leave of absence, and that plaintiff had agreed to undergo treatment, and a leave of absence was discussed at a union grievance meeting).

Accordingly, Defendants are entitled to summary judgment on Brandes's disability-discrimination claim.

### E. Intentional Infliction of Emotional Distress

Under Iowa law, a claim of intentional infliction of emotional distress requires proof of four elements:

> (1) outrageous conduct by the defendant; (2) the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress; (3) plaintiff suffered severe or extreme emotional distress; and (4) the defendant's outrageous conduct was the actual and proximate cause of the emotional distress.

*Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 26 (Iowa 2014) (quoting *Barreca v. Nickolas*, 683 N.W.2d 111, 123-24 (Iowa 2004)). The Iowa Supreme Court has recognized that a claim of intentional infliction of emotional distress may be brought in an employment case, but the element of "outrageous conduct" is especially hard to meet in the employment context. *Id.*

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Id.* (quoting *Van Baale v. City of Des Moines*, 550 N.W.2d 153, 156-57 (Iowa 1996)).

In *Vinson*, the Iowa Supreme Court held that defendant employers did not act outrageously when they "engaged in a deliberate campaign to badger and harass plaintiff,"[12] and their "actions were petty and wrong, even malicious." *Id.* at 27 (quoting *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 119 (Iowa 1984)). In *Smith*, the Iowa Supreme Court distinguished *Vinson*, noting that "the conduct [at issue in *Smith*] included, but also went beyond, typical bad boss behavior such as discrimination in pay, isolation of the employee, removal of the employee from work assignments, misrepresentations about promotions, and even falsification of records." *Id.* at 29. The facts that set *Smith* apart—and that the court relied on in finding sufficient evidence of outrageous conduct existed—was that the plaintiff's supervisor "engaged in unremitting psychological warfare against [plaintiff] over a substantial period of time," trying "to

---

[12] Specifically, the defendants' actions in *Vinson* included the following:
> delaying the plaintiff's start time, subjecting her to a time study that did not allow her the same amount of slack time as other employees, instructing her to inaccurately complete time records, accusing her of falsifying time records, denying her request to have her issues taken to the school board, discharging her on grounds of dishonesty, and reporting the incident to a prospective employer despite knowing the plaintiff had not acted dishonestly and knowing it would negatively affect her chances of acquiring new employment.

*Smith*, 851 N.W.2d at 27 (citing *Vinson*, 360 N.W.2d at 119).

Case 6:18-cv-02089-KEM   Document 45   Filed 07/22/20   Page 45 of 47

have him treated as a scary and mentally unstable outcast," all "to cover up . . . her theft" from their employer. *Id.* at 29.

Brandes argues that Defendants' actions here amount to outrageous conduct. Specifically, he points to his demotion, being "written up for normal activities," having his office moved and not being given the tools he needed to do his job upon his return from leave, and defendants' "ignoring his health concerns." Doc. 33-1 at 22. The facts here are more similar to *Vinson* than to *Smith*. Unlike in *Smith*, there is no evidence that Hoambrecker's disciplinary measures and other actions taken against Brandes were the result of trying to cover up his own misconduct (as discussed in connection with Brandes's wrongful-discharge claim). And there were valid reasons for much of the conduct Brandes complains of—e.g., poor job performance—that Brandes cannot establish were "groundless" (as discussed above in connection with the FMLA claim). *Cf. Blong v. Snyder*, 361 N.W.2d 312, 317 (Iowa Ct. App. 1984) (favorably cited in *Smith*) (holding that employer's conduct was outrageous when plaintiff was terminated but reinstated through the union grievance process, and upon his return to work, "subjected to verbal abuse on almost a daily basis"; assigned "extra work" without being given the proper tools for the job and then disciplined for failing to do it; and groundlessly accused of "stealing, wasting time, intentionally breaking his machine, intentionally producing inferior parts, violating fifteen company rules, and 'playing with himself' in the restroom"). Taking the facts in the light most favorable to Brandes, he can establish only "bad boss behavior" that does not rise to the level of outrageous conduct. *See also Hedlund*, 930 N.W.2d at 725 (holding that plaintiff, a police detective, could not establish the "outrageous" element when his supervisors and other officers came to his house to place him on administrative leave, confiscating his phone and weapon, as was standard practice; and his supervisor falsely suggested to the governor that he was a "threat to public safety," causing the governor to make a speech about plaintiff's termination where he said the termination was necessary for the "morale and for the

safety and well-being of the Department"). Accordingly, Defendants are entitled to summary judgment on Brandes's claim of intentional infliction of emotional distress.

## III.    CONCLUSION

Because I have found that Defendants are entitled to summary judgment on all Brandes's substantive claims, they are also entitled to summary judgment on Brandes's claim for punitive damages.

Defendants' motion for summary judgment (Doc. 24) is **granted**. Judgment should be entered in favor of Defendants.

**IT IS SO ORDERED** this 22nd day of July, 2020.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa